UNITED VIDEO, INC., et al., Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Association of Independent Television Stations, Inc. and National Association of Broadcasters, Intervenors.

TRIBUNE BROADCASTING COMPANY, Petitioner

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Capital Cities/ABC, Inc., Association of Independent Television Stations, Inc., and National Association of Broadcasters, Motion Picture Association of America, Inc., Meredith Corporation, Intervenors.

The COMMUNITY ANTENNA TELEVISION ASSOCIATION, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Association of Independent Television Stations, Inc., and National Association of Broadcasters, Capital Cities/ABC, Inc., Motion Picture Association of America, Inc., Meredith Corporation, ABC Television Affiliates Association, Intervenors.

Nos. 88–1514, 89–1244 and 89–1252.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 16, 1989.

Decided Nov. 17, 1989.

---

John P. Cole, Jr., with whom Wesley R. Heppler, Washington, D.C., was on the brief for petitioners, United Video, Inc., et al. in No. 88–1514.

Robert A. Beizer for petitioner Tribune Broadcasting Co. in No. 89–1244. R. Clark Wadlow, Washington, D.C., also entered an appearance for Tribune Broadcasting Co.

Frank W. Lloyd, Stephen R. Effros and James H. Ewalt were on the brief for petitioner The Community Antenna Television Ass'n, Inc. in No. 89–1252.

Daniel M. Armstrong, Associate Gen. Counsel, Washington, D.C., F.C.C., with whom Diane S. Killory, Gen. Counsel and C. Grey Pash, Jr., Counsel, F.C.C., James F. Rill, Asst. Atty. Gen., Robert B. Nicholson and Laura Heiser, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondents in Nos. 88–1514, 89–1244 and 89–1252.

Arthur B. Goodkind, with whom Henry L. Baumann for Nat. Ass'n of Broadcasters and Ass'n of Independent Television Stations, Inc., Joel Rosenbloom, for Capital Cities/ABC, Inc., James E. Dunstan, Washington, D.C., for Meredith Corp., Joseph W. Waz, Jr. and Fritz E. Attaway, for Motion

Picture Ass'n of America, Inc., and Wade H. Hargrove and Mark J. Prak, Raleigh, N.C., for ABC Television Affiliates Ass'n were on the joint brief for intervenors Nat. Ass'n of Broadcasters, et al. in Nos. 88-1514, 89-1244 and 89-1252. Michael H. Bader and David G. O'Neil, Washington, D.C., also entered appearances for Meredith Corp.

Before WALD, Chief Judge, and EDWARDS and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

A syndicated television program is a program marketed from its supplier to local television stations by means other than a television network. In 1988, the Federal Communications Commission reinstated its "syndicated exclusivity" rules. These rules allow the supplier of a syndicated program to agree with a broadcast television station that the station shall be the exclusive presenter of the program in its local broadcast area. A broadcast station with exclusive rights to a syndicated program can forbid any cable television station from importing the program into its local broadcast area from a distant station.

Petitioners, mostly cable television companies whose distant signal offerings will be restricted under the new rules, challenge the rules as arbitrary and capricious, and as violative of the Copyright Act of 1976, the Cable Act of 1984, and the first amendment. We find that the Commission's action is within its authority and is not arbitrary or capricious. Accordingly, we deny the petitions for review.

## I. BACKGROUND

This court has had several opportunities to examine the checkered history of the regulation of cable television by the Federal Communications Commission ("FCC" or "Commission"). *See, e.g., Century Communications Corp. v. FCC*, 835 F.2d 292,

293-97 (D.C.Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988); *Quincy Cable TV, Inc. v. FCC*, 768 F.2d 1434, 1438-45 (D.C.Cir.1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986); *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 18-25 (D.C.Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). As a prelude to our analysis in this case, we review briefly highlights from the history of syndicated exclusivity regulation ("syndex").

The volatile relationship between cable and broadcast television has traditionally hinged on the ability of cable television stations to receive the signal that a broadcast station sends over the air, and to retransmit that signal to subscribers via a cable. This retransmission is not a "broadcast," for it is not a dissemination of radio communications intended to be received by the public. *See* 47 U.S.C. § 153(*o*) (broadcasting defined). The Communications Act forbids a broadcast station from rebroadcasting another broadcast station's signal without permission, 47 U.S.C. § 325(a), but does not forbid cable retransmission.

Prior to the 1976 revision of the copyright laws, two Supreme Court decisions held that the distinction between broadcasting and cable transmission had important copyright law implications. *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968), held that when a cable company posted an antenna high on a hilltop, and ran a cable from the antenna into its subscribers' homes, it did nothing significantly different than an individual television owner does when she puts an antenna on her own roof, and runs a cable from it to her television inside. In particular, the cable company's retransmission was not a "performance" of the television program, and so did not violate the copyright on it. *Teleprompter Corp. v. CBS, Inc.*, 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974), extended this reasoning to cases where the cable brought a program to a distant market.[1] Accordingly, cable companies were

---

**1.** In some instances, the physical cable did not itself run all the way to a distant market. Rath-

free, as far as copyright law was concerned, to pick up signals aired by broadcasters and retransmit them throughout the country.

The distress felt by originating broadcasters whose signals were retransmitted in this way was matched only by the anger of local broadcasters in the receiving end communities, who watched the cable companies importing into their markets the very programs that they were themselves showing, and to which they had purchased exclusive broadcast rights. *See Rules Re Microwave–Served CATV*, 38 F.C.C. 683, 703–04 (1965). Even before the *Fortnightly* decision validated this practice against copyright claims, the FCC decided that it was an unfair form of competition. Beginning in 1965, the Commission promulgated exclusivity rules that protected local broadcasters from the importation into their markets of distant signals that duplicated signals to which they had purchased exclusive rights. 38 F.C.C. at 741–46. These rules provided nonduplication protection for both network and syndicated programs. In 1966, the Commission expanded the rules, which in 1965 covered only microwave cable systems, to all cable systems, and required all cable systems to notify the Commission before carrying any distant signal. *CATV*, 2 F.C.C.2d 725, 803–04 (1966).

The Commission for some time attempted to review every importation of a distant signal into any of the top one hundred local television markets for consistency with "the establishment and healthy maintenance of television broadcast service in the area." *See id.* at 804; *Cable Television Report & Order*, 36 F.C.C.2d 143, 148 (1972). This proved an administrative impossibility, however, and the Commission sought a more workable scheme. In 1972, the Commission adopted an industry "consensus agreement," that provided comprehensive regulation of the relationship between broadcast and cable television. 36

F.C.C.2d at 284–86. The consensus agreement included syndex rules. *Id.* at 284–85.

In 1976, Congress finally got around to addressing the question of the copyright liability of cable companies that carried distant signals. Congress provided, in the Copyright Revision Act of 1976, a compulsory licensing scheme whereby cable companies paid an administratively-set fee for such carriage. Subsequently, in 1980, the FCC decided that, given the new copyright regime, syndex protection was no longer in the public interest, although network exclusivity was retained. *CATV Syndicated Program Exclusivity Rules*, 79 F.C.C.2d 663 (1980). The Commission stated that the elimination of syndex would cause no significant harm to broadcast stations. *Id.* at 814.

Broadcast stations petitioned the Commission for a reconsideration of its negative position on syndex in 1984, but the Commission refused to budge, saying that there had been no change in circumstances that would justify a change in its position. *Syndicated Program Exclusivity and Sports Telecasts*, 56 RR2d (P & F) 625 (1984). In 1987, however, the Commission began another review of its 1980 decision to eliminate syndex, and in 1988 it promulgated the rules challenged in this case. *In the Matter of Amendment of Parts 73 and 76 of the Commission's Rules Relating to Program Exclusivity in the Cable and Broadcast Industries*, 3 F.C.C.Rcd 5299 (1988), *on reh'g*, 4 F.C.C.Rcd 2711 (1989) (rules codified at 47 C.F.R. §§ 73.658, 76.-92–76.97, 76.151–76.163). The Commission decided that its 1980 decision reflected an imperfect understanding of the role cable was to assume in the ensuing decade as a full competitor to broadcast television. The Commission found that with the enormous growth in cable's audience and advertising revenues, the lack of syndex was harming broadcast stations, and might have been significantly affecting the supply of syndicated programs. The Commis-

er, the cable company, having received the broadcast transmission over the air, sent it over the air again to the company's antenna in the distant market, and from that antenna to subscribers via a cable. This over-the-air retran-

smission, however, was still not a "broadcast," because it was intended for receipt only by the cable company's distant antenna and not by the public. *See Teleprompter*, 415 U.S. at 399 n. 4, 94 S.Ct. at 1133 n. 4.

sion decided to reinstate syndex in view of the changes in the cable television industry that occurred between 1980 and 1988.

## II. ARBITRARINESS AND CAPRICE

### A. *The Commission's Factual Findings*

The Commission's decision to reinstate syndex rests on its finding that syndex rules will promote diversity in syndicated programming. In the report accompanying the rules, the Commission found that unrestricted importation of distant signals (*i.e.,* no syndex protection) leads to duplication of programming in local broadcasting areas; this duplication lessens the value of syndicated programs to broadcast stations; that loss of value in turn lowers the price syndicated program suppliers will receive for their programs; and all of this ultimately reduces the incentive for syndicated program suppliers to produce programs, which translates into a reduction in the diversity of programming available to the public. *See* 3 F.C.C.Rcd at 5305–07. On the basis of this scenario, the Commission concluded that syndex rules should be reinstated in order to promote diversity of programming.

The petitioners challenge the FCC's rule as arbitrary and capricious, for want of support in the rulemaking record. Our review on such a claim is narrow: the court must not substitute its judgment for that of the agency, but it must ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made." *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *ALLTEL Corp. v. FCC,* 838 F.2d 551, 556 (D.C.Cir.1988). Since this action represents a change in agency policy, the court must also ensure that the agency supplied a "reasoned analysis indicating that its prior policies and standards are being deliberately changed, not casually ignored." *Action for Children's Television v. FCC,* 821 F.2d 741, 745 (D.C.Cir.1987). We will examine

each of the links in the Commission's alleged causal chain.

### 1. Duplication

The petitioners do not challenge the Commission's finding that unrestricted importation of distant signals leads to duplication of programming between broadcast and cable channels. Petitioner Tribune, for instance, itself submitted a study to the FCC showing that the lack of syndex rules leads to substantial duplication. *See* Brief for Petitioner CATA at 26 n. 55. The Commission's report cites several studies that show duplication, and notes that the comments received "basically agree on the fact of substantial duplication." 3 F.C.C.Rcd at 5305. This point therefore seems amply supported by the rulemaking record.

### 2. Lessening of the Value of Syndicated Programs to Local Broadcast Stations

■ The petitioners hotly contest the Commission's finding that program duplication lessens the value of syndicated programs purchased by local broadcast stations. However, the Commission's report cites substantial evidence from which it could reasonably draw this conclusion. The Commission discusses two related ways in which duplication lessens the value of syndicated programs: audience diversion and the loss of exclusivity as a competitive tool.

The Commission found that duplication of programming diverts a substantial portion of the broadcast audience to cable. The evidence was strongest regarding diversion caused by a cable station's *simultaneous* transmission of a program being aired by a broadcast channel, for such diversion can be gauged by ratings information. Numerous stations reported a substantial number of viewers that chose to watch a duplicated program on the cable rather than the broadcast channel. Although the Commission correctly observed that not every viewer who watched the program on cable would watch it on the broadcast channel if that were the only way to watch it, and that these numbers

therefore did not provide a mathematically precise measure of audience diversion, 3 F.C.C.Rcd at 5305, the Commission was surely justified in concluding that significant diversion was occurring.

The Commission reasonably inferred that diversion lessened the value of the programming by lowering advertising revenues. The petitioners contest this finding, claiming it is based on a single study, which they attack as faulty. However, the report makes clear that the Commission relied on the study for only a rough approximation of the decrease in advertising revenue. More important was the hardly controversial conclusion that the amount advertisers will pay depends on the size of the audience that a program attracts. 3 F.C.C.Rcd at 5306; 4 F.C.C. Rcd at 2716. This statement needs no detailed study to support it.

The Commission addressed some allegedly contrary evidence, including the submission, by the National Cable Television Association ("NCTA"), of a study showing that local ratings for syndicated programs are higher for those programs that are duplicated than for those that are not. Although the NCTA claimed that this study shows that duplication does not lessen broadcast channels' viewership, the Commission quite reasonably concluded that the data simply show that the more popular a syndicated program is, the more likely it is that a cable station will choose to duplicate it. 3 F.C.C.Rcd at 5305-06. The study certainly does not make arbitrary the Commission's belief that the broadcast channel's ratings would be even higher in the absence of duplication.

The Commission's report does not specify quite so clearly how it reached the conclusion that *nonsimultaneous* transmission of duplicative programming (including transmission of different episodes of the same program) also causes audience diversion. The one sentence explicitly devoted to this question in the report says that "the quantity of non-simultaneous duplication documented in the record in this proceeding, taken as a whole, presents compelling evidence that substantial diversion is taking place." *Id.* at 5306. This sentence suggests that the Commission has simply assumed diversion from the conceded fact of nonsimultaneous duplication. The Commission points to no specific empirical support for this statement in the record.

While it is intuitively reasonable to assume that simultaneous duplication causes diversion, the question of nonsimultaneous duplication seems more varied and complex. A cable company's transmission of a feature film, for example, might reduce the audience for a broadcast of that film for weeks afterwards. But if a broadcast channel airs an old episode of MASH at 6:00 p.m., will a substantial number of viewers be diverted because a cable channel is offering a different old episode at 11:00 p.m.? The Commission's report offers no way to tell, and it is possible that the 6:00 p.m. and 11:00 p.m. time slots attract quite diverse audiences. If the Commission had relied solely on its assumption of audience diversion as evidence that nonsimultaneous duplication lessens the value of programs to broadcast stations, we might well have felt obliged to require some supplementation or further explanation of its reasoning.

However, the Commission relies on more solid evidence that duplication makes programming less valuable. The evidence is that all stations, broadcast and cable, want exclusivity. Many broadcasters, in their comments supporting the syndex rules, identify exclusivity as the key to programming success. *E.g.,* Comments of Tulsa 23, Ltd *et al.,* Joint Appendix ("J.A.") 293. Even more telling, cable companies themselves regularly take advantage of their ability to obtain exclusive rights in programming. *See* 3 F.C.C.Rcd at 5308, 5336 n. 122. The reason, as the FCC notes in its report, is that exclusivity gives stations the opportunity to promote themselves as the only presenter of a certain program. If a broadcaster spends money promoting a duplicated program, some of the value of the expenditure will be captured by the cable company that is importing the same program. Syndex will give the local broadcaster a competitive tool that it can use both to call attention to the particular pro-

gram and to "alert viewers to the general attractiveness of the broadcaster's whole range of programming." 3 F.C.C.Rcd at 5309.[2] The strong desire of all stations for complete exclusivity is evidence that even nonsimultaneous duplication lessens the value of programming, whether because of audience diversion or for other reasons.

While the Commission's report may leave something to be desired in its detail on the dangers of nonsimultaneous duplication, we do not think its conclusion that even this type of duplication lessens the value of programming for broadcast stations can be called arbitrary or capricious. The record as a whole shows that both broadcast and cable companies want complete exclusivity; the Commission did not act without reason in concluding that exclusivity must be a valuable commodity, and conversely that lack of exclusivity diminishes the value of a program.

### 3. Effects on Program Supply

The weakest link in the FCC's causal chain is its claim that reinstating syndex protection will affect the supply of syndicated programming. And indeed, throughout the rulemaking proceeding, the Commission has always conceded that there is no direct, empirical evidence that syndex will actually increase program diversity, explaining that such evidence would be particularly difficult to obtain empirically. 3 F.C.C.Rcd at 5307; 4 F.C.C.Rcd at 2715; Brief for Respondent at 49.

■ We do not think that the absence of empirical evidence is fatal to the Commission's claim. Courts reviewing an agency's selection of means to accomplish policy goals are "not entitled to insist on empiri-

cal data for every proposition on which the selection depends." *Associated Gas Distributors v. FERC*, 824 F.2d 981, 1008 (D.C.Cir.1987). In *Century Communications Corp. v. FCC*, 835 F.2d 292 (D.C.Cir. 1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988), which struck down the FCC's must-carry regulations, this court noted that an agency contention may be "so obvious or commonsensical that it needs no empirical support to stand up." *Id.* at 302.

We think the Commission's conclusion about the link between lack of program diversity and lowered broadcast revenues due to lack of exclusivity is sufficiently in accord with accepted economic theory that it can stand without empirical support, particularly since we agree with the Commission that it would be very difficult for it to show the degree to which programs are currently *not* being produced because of the lack of syndex protection. We said in *Associated Gas Distributors* that no experiment was required before an agency could predict that competition would normally lead to lower prices. 824 F.2d at 1008–09. This case is similar: the FCC has assumed only that increasing the value of programs to broadcast companies will increase the amount paid for them, and that these higher prices will improve product supply. The Commission explains that "[p]rogram suppliers, like other business people, respond to incentives.... Incentives to develop new programs are greatest when program suppliers are able to sell their programs wherever there are viewers (or advertisers) willing to pay for them." 3 F.C.C.Rcd at 5309. These claims, unlike the ones made by the FCC in *Century Communications*,[3]

---

**2.** Even cable company executives, the Commission noted, stress the strategic importance of exclusivity, though they did not do so, of course, in the syndex proceeding. 3 F.C.C.Rcd at 5336 n. 122 (citing statements made to industry trade magazines); *see also* Comments of the Motion Picture Association of America, J.A. 313–18 (providing list of cable stations that have acquired exclusive rights to programming); *id.* at 315 n. 79 (citing *Broadcasting,* Sept. 22, 1986, at 62 (senior vice president of Showtime cable company says that exclusivity is company's strategy for the future; senior vice president of the HBO cable company says that HBO's origi-

nal programming, "'which is proprietary ... [and] unique to HBO—that proprietary programming gives us a very big echo' in the press and through word of mouth ... and is a way to attract nonsubscribers")).

**3.** The FCC claimed in that case that consumers would need five years to learn about and install an inexpensive, hardware-store switch that would preserve their access to local broadcast stations that were not carried by cable. Neither empirical evidence nor economic theory supported this claim. *See* 835 F.2d at 300–04.

do not "beg[ ] incredulity," 835 F.2d at 302; rather, they are reasonable.

The petitioners argue in response that despite the lack of syndex protection, syndicated programming and broadcast television are thriving. Absent any actual evidence that syndex would increase program supply, they claim that the current robust health of the market shows that syndicators and broadcast stations are suffering no harm that requires FCC correction. Brief for Petitioner CATA at 24–26, 35. However, the Commission properly rejected this argument as irrelevant. 3 F.C.C.Rcd at 5321; 4 F.C.C.Rcd at 2716. Syndicators may be doing well, but that does not show that they would not do better if they could capture the full value of their programs. The FCC is not empowered to regulate the market only in cases where regulation is necessary to save broadcast stations or syndicators from economic peril. Increasing program diversity is a valid FCC regulatory goal, *Malrite TV of New York v. FCC,* 652 F.2d 1140, 1151 (2d Cir.1981), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982), and increasing revenues for program originators a likely means of achieving it.[4]

Having tested each link in the Commission's causal chain, we find that it used valid reasoning to conclude that syndex rules will increase the diversity of programming options available to the public. Its imposition of syndex was adequately supported by the rulemaking record.

B. *Change in Agency Course*

■ The petitioners complain that the Commission has not adequately explained why it is reinstating syndex rules only eight years after abandoning them, and

only four years after reaffirming its decision to abandon them. However, the Commission's report, which examines in great detail its 1980 decision to eliminate syndex, meets this circuit's standard that an agency changing course must "supply a reasoned analysis indicating that its prior policies and standards are being deliberately changed, not casually ignored." *Action for Children's Television v. FCC,* 821 F.2d 741, 745 (D.C.Cir.1987).

The Commission's report reviews in detail the history of the regulation of cable, including, in particular, the 1980 decision to eliminate syndex rules. 3 F.C.C.Rcd at 5300–05. The report notes several ways in which the Commission now feels the 1980 decision to have been inadequate. First, the report discusses how circumstances have changed since 1980. The principal change has been the unforeseen emergence of cable television as a full competitor to broadcast television. As the report documents, cable's audience and advertising revenues have increased dramatically and unexpectedly since 1980. In 1980, cable served 19% of television households, but in 1988 it served 51%, a percentage the FCC projected would rise to 60% by 1996. 3 F.C.C.Rcd at 5304. In 1980, the Commission had predicted that cable penetration would never go beyond 48%. *Id.* Cable advertising revenues were $45.5 million in 1980, but they grew to over $1 billion in 1988; cable's share of total television advertising revenue climbed from less than 0.5% to more than 6%. *Id.* This unexpected growth, the Commission notes, substantially undermines its 1980 findings that repeal of syndex would not cause significant audience diversion or otherwise harm broadcast stations.

---

**4.** Furthermore, the Commission notes that syndex can improve the programming mix in the local television markets even if it does not lead to a change in program supply. Without syndex protection, local broadcasters may find it uneconomical to purchase certain programs that they would purchase if they could get exclusivity. *See* 3 F.C.C.Rcd at 5310–11; Comments of the Motion Picture Association of America, J.A. 329–30; *National Cable Television Ass'n, Inc. v. Copyright Royalty Tribunal,* 724 F.2d 176, 189 (D.C.Cir.1983) (noting this problem). As a re-

sult, television viewers in that area who do not subscribe to cable will not be able to see those programs at all. Of course, with syndex rules in place, the program could become unavailable on cable if a local broadcaster buys exclusive rights to it, but that result is still preferable to the market distortion caused by lack of syndex rules, because with syndex, the broadcasters and the cable companies can engage in competition that results in the program being carried by the station whose viewers value it most.

The Commission also faults its earlier studies for focusing on the effects repeal of syndex would have on individual stations, rather than its effects on the competitive process and the incentive for production of new programs. Lack of syndex protection, as discussed above, distorts the broadcaster's promotional incentives and makes it impossible for syndicators to capture the full value of their programs. A competitive process in which exclusivity contracts are enforceable will, the Commission now believes, produce the best programming for the public. *Id.* at 5303.

The Commission's report also examines the negative aspects of syndex rules. It acknowledges the costs in reimposing syndex: cable companies will need to purchase new equipment to comply, and the necessity of deleting protected programs will cause some disruption in cable service. However, the report concludes that the equipment cable companies will need is currently available and reasonably priced, and disruption will be lessened by the one-year delay between the announcement and effective date of the rules. *Id.* at 5312.

The Commission in its report also acknowledges that the absence of syndex provides consumers with the benefit of "time and episode diversity." A cable station, free of syndex restraints, may import a different episode of a program than the one aired by a broadcast station, or the same episode at a different time of day. The Commission suggests, however, that this diversity must be balanced against the lack of diversity engendered by duplication, and by the reduced incentive for the production of new programs. The Commission also suggests that market forces will allow duplication where viewers value it sufficiently, since stations with exclusive rights to a program can always sell the right to duplicate it. Finally, the Commission notes that the value of cable in providing time diversity has been lessened by the significant increase in the penetration of video cassette recorders (up from 1.5% of television households in 1979 to 58.1% today), since VCRs allow viewers to provide time diversity for themselves. *Id.* at 5307.

The Commission's report *in toto* suggests that it undertook a thoroughgoing review of the syndex question and came to a new result with full awareness of its prior choices. The petitioners compare the Commission's action to that overturned by this court in *Action for Children's Television v. FCC,* 821 F.2d 741 (D.C.Cir.1987). But the comparison is not valid. In that case, the Commission had issued a general rule repealing all quantitative commercial guidelines for television broadcasting. When asked to clarify whether this rule covered children's television, for which the Commission had traditionally required extra protection against overcommercialization, the Commission issued a mere two sentences to explain its new feeling that no extra protection was needed. This court held that the Commission had "crosse[d] the line from the tolerably terse to the intolerably mute." *Id.* at 746. In the present case, the Commission's detailed report assures us that it has given full consideration to the change it made, and explains its reasons for doing so. Accordingly, we reject the petitioners' claim that the Commission's rules are arbitrary and capricious.

### III. THE COMMISSION'S AUTHORITY

The petitioners also claim that the Commission lacks authority to impose the syndex rules. The rules, petitioners claim, are contrary to § 111 of the Copyright Revision Act of 1976, 17 U.S.C. § 111 (1982) ("the Copyright Act"), to § 624(f) of the Cable Communications Policy Act of 1984, 47 U.S.C. § 544(f) (Supp. III 1985) ("the Cable Act"), and to the first amendment. We consider, and reject, these challenges in turn.

First, however, we inquire as to the source of the Commission's affirmative authority to impose syndex rules. The Commission's report claims authority under its "general authority to regulate the relationships of broadcasters and program suppliers"; an aspect of the Commission's power, under 47 U.S.C. § 303(r), to "make such rules and regulations and prescribe such restrictions and conditions, not inconsistent

with law, as may be necessary to carry out the provisions of" the Communications Act, as "public convenience, interest, or necessity requires." *See* 3 F.C.C.Rcd at 5320, 5329 (the rules begin with the statement, "Authority: 47 U.S.C. 154 and 303").

The Commission's power under § 303(r) is broad. Even before the 1984 Cable Act, which explicitly gave the Commission power over cable television, the Commission's § 303(r) powers had already been held to permit it to order a cable television station not to carry the signal of a broadcast station outside the broadcast station's primary market. *United States v. Southwestern Cable Co.*, 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). Syndex rules are rules that the Commission has found necessary to carry out its mandate under the Communications Act; they clearly fall within the Act's general authority, the regulation of interstate and foreign communication by wire or radio, 47 U.S.C. § 152(a); and, as we concluded above, the rules were reasonably adopted in furtherance of a valid communications policy goal. Hence, they fall under the Commission's § 303(r) powers unless they are "inconsistent with law." *See FCC v. National Citizens Comm. for Broadcasting*, 436 U.S. 775, 796, 98 S.Ct. 2096, 2112, 56 L.Ed.2d 697 (1978).[5] We therefore turn to the provisions of law with which the petitioners claim syndex is inconsistent.

## A. *The Copyright Act*

The 1976 Copyright Act, now Title 17 of the United States Code, struck a balance between the rights of copyright owners and the needs of cable television stations. Under the relevant Supreme Court decisions prior to 1976, it was not a copyright violation for cable television stations to retransmit the signal of broadcast stations. Congress, in 1976, decided that when a cable station carries a broadcast station's signal into a distant market, it ought to pay a fee for the carriage. But Congress also believed that it would be impracticable for cable companies to negotiate individually with every copyright owner whose work they wished to carry. Congress therefore created a compulsory licensing scheme, embodied in § 111 of the Act, that provides for payment to copyright owners without the need for individual negotiations. Under the Act, cable stations may carry copyrighted signals into distant markets upon payment of a fee set by the Copyright Royalty Tribunal ("CRT" or "Tribunal"). The Tribunal distributes these fees to copyright owners. *See* 17 U.S.C. §§ 111(d)(2)–(4), 801(b)(3).

According to the petitioners, § 111 provides the exclusive means by which copyright owners can seek remuneration from cable companies. The FCC, the petitioners claim, has authority only over communications law and has no power to interfere with copyright matters. Syndex therefore represents, according to the petitioners, an impermissible attempt by the FCC to impose on cable television stations the very copyright liability that Congress decided should not exist. The petitioners claim both that the FCC lacks authority to affect copyright liability *at all*, and also that it cannot make an administrative decision that will effectively nullify Congress' statutory decision to create a compulsory licensing scheme for cable television.

We must resolve this difference between the petitioners and the Commission by us-

---

5. At one point in its report, the Commission somewhat casually suggests that § 624(f) of the Cable Act provides express authority for its imposition of syndex. *See* 3 F.C.C.Rcd at 5320. *But see id.* at 5324 (stating only that § 624(f) provides express support for the Commission's conclusion that it has authority). The petitioners hotly contest the assertion that § 624(f) grants the Commission any affirmative authority. *See infra* Part III(B). We believe that § 624(f) and two other provisions of law discussed below (the Copyright Act and the Satellite Home Viewer Act) are not themselves grants of authority to the Commission to impose syndex rules, although the express references to the Commission's syndex rules in the latter two acts confirm our view that the Commission has such authority. *See infra* pp. 1185, 1189 n. 14; *cf. City of New York v. FCC*, 486 U.S. 57, 108 S.Ct. 1637, 1644, 100 L.Ed.2d 48 (1988) ("In the Cable Act Congress sanctioned in relevant respects the regulatory scheme that the Commission had been following since 1974."). The source of the authority, as the Commission's rules reflect, is 47 U.S.C. § 303.

ing *Chevron* analysis. *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1983). First, we must ask "whether Congress has directly spoken to the precise question at issue," which in this case is whether § 111 bars the Commission from imposing syndex rules. If the intent of Congress is clear, we must give it effect. *Id.* at 842–43, 104 S.Ct. at 2781–82. In determining the intent of Congress, we must look to "the particular statutory language at issue, as well as the language and design of the statute as a whole," *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988), and we must employ traditional tools of statutory construction, including, where appropriate, legislative history. *Ohio v. United States Department of the Interior,* 880 F.2d 432, 441 (D.C.Cir.1989).[6]

■ The fundamental problem with the petitioners' argument is that syndex rules were in place when Congress passed the Copyright Act in 1976. We believe that Congress, in the 1976 Act, directly addressed the issue of the Commission's authority to promulgate syndex rules. Abundant evidence in both the text and history of the Act, discussed in detail below, shows that Congress was fully aware of syndex and chose to let it remain in place until the Commission decided to change it. From this evidence, we are unable to draw any other conclusion than that the 1976 Congress believed syndex regulation to be a permissible accoutrement of a regime of compulsory licensing. Congress delegated to the Commission the question of whether, given compulsory licensing, syndex regulation continued to be wise.

Furthermore, the text and history of the Copyright Act show that the petitioners have fundamentally misconceived the relationship between copyright law and communications law. Insofar as they apply to cable television, the 1976 Congress did not imagine copyright law and communications law to be two islands, separated by an impassable sea. Rather, Congress was aware of the interplay between copyright and communications law, and knew that the FCC would have a role to play in determining the scope of compulsory licensing. Congress intended that the Commission's communications policy decisions concerning which signals cable television could carry would affect the copyright liability of cable television companies.

### 1. The Text of the Copyright Act

An examination of the 1976 Act reveals a very different picture from that presented by the petitioners. Section 111 does *not* grant cable companies a blanket right to obtain a compulsory license to retransmit any and all programs transmitted by broadcast companies. Rather, the Act says:

> secondary transmissions to the public by a cable system of a primary transmission made by a broadcast station licensed by the [FCC] ... shall be subject to compulsory licensing ... *where the carriage of the signals comprising the secondary transmission is permissible under the rules, regulations, or authorizations of the [FCC].*

17 U.S.C. § 111(c)(1) (emphasis added). The Act thus explicitly withholds a compulsory license from cable companies in cases where the FCC forbids the cable companies' transmissions. It is therefore no surprise that the FCC can affect the copyright liability of cable television companies. The balance struck between copyright owners and cable companies incorporates FCC regulations, showing that Congress intended

---

**6.** This is "step one" of *Chevron.* If the statute is silent or ambiguous on a particular issue, the court normally proceeds to "step two" of *Chevron,* under which it must defer to the agency's interpretation of the statute so long as it is reasonable and consistent with the statutory purpose. *Chevron,* 467 U.S. at 844–45, 104 S.Ct. at 2782–83. However, the normal basis for deference to agency interpretations is the agency's familiarity with and expertise concerning statutes it is entrusted to administer. *Id.* at 844, 104

S.Ct. at 2782. The FCC, one might claim, is not entrusted to administer the Copyright Act, and so does not deserve the deference provided for by *Chevron's* step two. *See Illinois National Guard v. FLRA,* 854 F.2d 1396, 1400 (D.C.Cir. 1988) (court gives no deference to agency interpretation of statute other than that which it has been entrusted to administer). However, since we resolve this case under *Chevron's* step one, we do not need to consider whether step two deference would be appropriate.

the FCC to play a role in determining the extent to which compulsory licenses would be available.

Furthermore, the Act makes clear that the 1976 Congress was aware that syndex rules were part of the "rules, regulations, and authorizations" of the FCC. Section 801 of the Act establishes the Copyright Royalty Tribunal and gives it the power to set and periodically to adjust the fee that cable companies must pay for a compulsory license obtained pursuant to § 111. In listing the factors the CRT may consider when setting and adjusting the fee, the Act says:

> *In the event of any change* in the rules and regulations of the [FCC] with respect to syndicated and sports program exclusivity after April 15, 1976, the rates established by section 111(d)(2)(B) may be adjusted to assure that such rates are reasonable in light of the changes to such rules and regulations[.]

Section 801(b)(2)(C) (emphasis added). The emphasized phrase shows that Congress knew that passage of the Copyright Act might, but also might not, cause the FCC to alter its policy with respect to syndex. By instructing the CRT to adjust its rates "in the event of any change" in syndex rules by the Commission, Congress showed that it left the syndex question to the Commission's discretion.

### 2. Legislative History of the Copyright Act

The legislative history of the Copyright Act confirms and makes even clearer the power of the Commission to decide whether there should be syndex rules. In particular, the history explains the relationship between copyright and communications policy that Congress envisioned when it passed the Copyright Act.

The House Report, in commenting on § 111, noted that prior to 1976 it was not a copyright violation for cable companies to retransmit over-the-air broadcast signals. Accordingly, cable channels, except insofar as they were restrained by existing FCC regulations such as syndex, were retransmitting the signals of broadcast channels and not paying any royalties at all. *See* H.R.Rep. No. 1476, 94th Cong., 2d Sess.

88–89, *reprinted in* 1976 U.S.Code Cong. & Admin.News 5659, 5703 [hereinafter 1976 USCCAN]. The problem of these secondary transmissions was, the report noted, "complex and economically important," *id.* at 88, 1976 USCCAN at 5702, and the question of the copyright liability of cable companies had been before the Congress since 1965, *id.* at 89, 1976 USCCAN at 5703. The report particularly noted that the question of copyright liability was closely tied to that of FCC–created communications policy:

> [T]here is no simple answer to the cable-copyright controversy. In particular, any statutory scheme that imposes copyright liability on cable television systems must take account of the intricate and complicated rules and regulations adopted by the Federal Communications Commission to govern the cable television industry. While the Committee has carefully avoided including in the bill any provisions which would interfere with the FCC's rules or which might be characterized as affecting 'communications policy', the Committee has been cognizant of the interplay between the copyright and the communications elements of the legislation.

*Id.* at 89, 1976 USCCAN at 5703. The report went on to stress again that the Act's imposition of copyright liability on cable companies was not intended to alter FCC communications policy rules:

> We would, therefore, caution the Federal Communications Commission, and others who make determinations concerning communications policy, not to rely upon any action of this Committee as a basis for any significant changes in the delicate balance of regulation in areas where the Congress has not resolved the issue. Specifically, we would urge the Federal Communications Commission to understand that it was not the intent of this bill to touch on issues such as pay cable regulation or increased use of imported distant signals. These matters are ones of communications policy and

should be left to the appropriate committees in the Congress for resolution.

*Id.* at 89, 1976 USCCAN at 5703–04.

These excerpts show that Congress did not picture the compulsory licensing scheme as a comprehensive solution to the communications policy problems posed by cable television. Rather, Congress used compulsory licensing as a means of making workable its decision to impose copyright liability on cable companies. The Act did not change the set of signals that cable channels could carry; it only created what Congress considered an efficient scheme whereby cable companies could be made to pay for those signals they were authorized to carry. As the report put it, "the Committee has determined ... to establish a compulsory copyright license for the retransmission *of those* over-the-air broadcast signals that a cable system is authorized to carry pursuant to the rules and regulations of the FCC." *Id.* at 89; 1976 USCCAN at 5704 (emphasis added). Given that syndex regulations were part of the rules and regulations that determined what signals a cable system was authorized to carry in 1976, and that the Committee specifically cautioned the Commission to understand that the Act did not touch on matters such as the increased use of imported distant signals, the Act cannot be read as forbidding syndex.[7]

If any further clarity were desired, the comments on § 801, like § 801 itself, would show that the syndex question is the sort of communications policy question that the Copyright Act does *not* resolve:

> The syndicated and sports program exclusivity rules of the FCC have the effect of protecting copyright owners by restricting the cable carriage of certain distant television programming. *If these rules are changed in the future to relax or increase the exclusivity restrictions,* it is the Committee's judgment that the royalty rates paid by cable systems should be adjusted to reflect such changes.

*Id.* at 177, 1976 USCCAN at 5793 (emphasis added). These comments show that the question of whether syndex protection should be lessened, left unchanged, or even heightened, was left to the FCC to decide.

In short, the text and history of the Copyright Act show that Congress was aware of the interplay between copyright and communications law. The regime Congress created allows the FCC's communications policy decisions to affect copyright liability. Congress was specifically aware of, and chose to leave unchanged, the Commission's authority to impose syndex rules. The petitioners are therefore wrong to claim that the FCC cannot, in exercising its communications policy powers, make a decision that affects their copyright liability.[8]

■ We must also reject petitioners' claim that syndex effectively nullifies compulsory licensing. The text and history reviewed above show that Congress did not consider syndex regulation to be inconsistent with a compulsory licensing scheme. The petitioners compare syndex to a "retransmission consent requirement"—a requirement that a cable station obtain the consent of each broadcaster whose signal it wishes to carry—which the Commission concedes would be an impermissible interference with compulsory licensing. It is true that if enough broadcasters take advantage of their ability to obtain exclusive

---

7. The petitioners, at oral argument, pointed out that must-carry rules also existed in 1976, and yet we subsequently struck them down in *Century Communications Corp. v. FCC,* 835 F.2d 292 (D.C.Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988). That case, however, shows only that the must-carry rules were not preserved from *constitutional* challenge. The question of whether rules existing when a statute was passed are forbidden *by that statute* is obviously very different from the question of whether rules are constitutional. Congress, by statute, cannot decide whether existing rules are constitutional, but the fact that rules are in existence when a statute is passed must have at least some bearing on the question of whether Congress intended that very statute to forbid them.

8. Of course, we are not saying that the Commission has a general power to affect copyright law. We are only saying that under § 111 the Commission can, by exercising powers granted to it by the Communications Act, affect the copyright liability of cable television companies.

rights in programming, the practical difference between syndex and a retransmission consent requirement may be small.[9] We confess that we find it somewhat surprising that Congress, on the one hand, created a compulsory licensing scheme and, on the other hand, let stand a regulation that could greatly limit the set of signals for which that scheme would be effective. However, we think it clear that that is precisely what Congress did, with full knowledge of what it was about. It is not for us to tell Congress how to create a compulsory licensing scheme. Congress clearly thought in 1976 that compulsory licensing and syndex could peaceably coexist, and whatever changes in the industry have come about since, that is the end of the matter.

We accordingly hold that Congress' intent concerning the question of whether the Copyright Act deprives the FCC of power to impose syndex rules is clear. Under *Chevron* step one, we give effect to that intent: we hold that the Copyright Act does not deprive the FCC of that power.[10]

### B. *The Cable Act*

The Cable Communications Policy Act of 1984 amended the Communications Act to explicitly grant the FCC a power it had previously only inferred from its general authority to regulate television: the power to regulate cable television. *See* Pub.L. No. 98–549, § 3(a), 98 Stat. 2801 (1984) (codified at 47 U.S.C. § 152(a)). However,

the Act also set some limits on that power, and in particular it provided:

(1) Any Federal agency, State, or franchising authority may not impose requirements regarding the provision or content of cable services, except as expressly provided in this subchapter.

(2) Paragraph (1) shall not apply to—

(A) any rule, regulation, or order issued under any Federal law, as such rule, regulation, or order (i) was in effect on September 21, 1983, or (ii) may be amended after such date if the rule, regulation, or order as amended is not inconsistent with the express provisions of this subchapter; and

(B) any rule, regulation, or order under Title 17.

47 U.S.C. § 544(f).[11] The petitioners claim that this section forbids syndex rules.

The Commission argues that the legislative history of § 544(f) shows that the term "requirements," as used in the section, refers only to *affirmative* requirements, that is, to rules that a cable station *must* carry a certain program or channel or type of program or channel, and does not prohibit negative requirements, that is, rules prohibiting cable stations from carrying certain signals. Indeed, the Commission also believes § 544(f), far from prohibiting syndex, actually authorizes it, as a permissible amendment to regulations existing when the Cable Act was passed. *See* § 544(f)(2). The petitioners call this argument a great many names, the more colorful of which

**9.** We find unpersuasive the Commission's argument that a retransmission consent requirement imposes an affirmative burden on cable companies to obtain the consent of broadcasters before retransmitting, whereas under syndex the basic presumption is that retransmission is allowed, and cable companies are forced to act only after broadcasters take the affirmative step of asserting their exclusive rights. This affirmative obligation/negative obligation distinction is, we feel, too ephemeral to rely on. The real question is the extent to which cable companies' ability to retransmit signals will be limited, and, practically speaking, the limits could be the same under either scheme if enough broadcasters took advantage of syndex.

**10.** The petitioners also claim that syndex is impermissible because of the Copyright Act's pre-

emption section, which provides that all rights equivalent to exclusive rights within the general scope of copyright are governed exclusively by Title 17. 17 U.S.C. § 301. However, § 111, which is part of Title 17, specifically incorporates FCC regulations as part of the requirements governing the availability of compulsory licenses. The very act that incorporates FCC *regulations cannot preempt those same regulations.*

**11.** The Commission's report stated that even if the syndex rules were within the bar of § 544(f)(1), they were protected by the exceptions listed in § 544(f)(2). However, since we find that syndex does not fall within § 544(f)(1)'s bar, we do not need to consider the exceptions.

are set out in the margin,[12] but the only argument they offer in return is that the meaning of § 544(f) is clear on its face. Indeed, although they do not specify with precision what they think "requirements" means, the petitioners claim that section 544(f) forbids syndex regulation so clearly that reference to its legislative history as an aid to construction is impermissible. Brief for Joint Petitioners United Video, Inc., *et al.* at 29 nn. 42 & 43 (citing *United States v. Missouri Pacific R.R.*, 278 U.S. 269, 278, 49 S.Ct. 133, 136, 73 L.Ed. 322 (1929)).

▇ Again applying *Chevron's* step one, we inquire whether Congress has expressed its intent on the question of whether § 544(f) bars syndex. We first hold that § 544(f) is not so clear that we must ascertain its plain meaning without resort to legislative history. On its face, the section could bear more than one meaning. The phrase "requirements regarding the provision or content of cable services" could be a broad reference to any regulation that would in any way affect the content of cable services. On the other hand, a content "requirement" could refer, as the FCC suggests, only to a content that is required, that is, made mandatory.

We also note that the Act, in another section, uses the term "requirements" in a context that strongly suggests an affirmative obligation. Section 531(a) states that a local franchising authority may establish "requirements" with respect to the designation or use of channel capacity for public, educational, or governmental use, to the extent provided for in § 531. We doubt that Congress meant to give franchising authorities power to *restrain* the designation of channel capacity for such use; indeed, it hardly seems likely that a franchising authority would ever have occasion to do so. Congress intended, as stated in § 531(b), to give franchising authorities the power to *"require* ... that channel capaci-

ty be designated for" such use. This parallel use of "requirement" and "require" suggests that the word "requirement" can bear an affirmative-only sense. Of course, other uses of the word "requirements" in the Cable Act, *see also* §§ 544(b)(2), 545(a)(1), do not conclusively determine the meaning of the word in § 544(f), but they do strongly suggest that that section does not *clearly* compel the petitioners' interpretation.

We therefore find a resort to the legislative history entirely appropriate, and that history usefully explains the context in which Congress adopted § 544(f). It had been the practice of local franchising authorities, in granting cable franchises, to specify in great detail the type of facilities that the operator must construct, and also to specify "the services that the operator must provide (*e.g.,* Cable News Network, HBO, The Health Channel)." H.R.Rep. No. 934, 98th Cong., 2d Sess. 26, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4655, 4663. Congress determined that local governments should have the power to require particular cable facilities, but "the Committee does not believe it is appropriate for government officials to dictate the specific programming to be provided over a cable system." *Id.* This historical context supports the Commission's belief that when Congress forbade "requirements regarding the provision or content of cable services," its concern was with rules requiring cable companies to carry particular programming.

However, having consulted the legislative history, we cannot agree with the Commission's contention that, as used in § 544(f), the word "requirements" was meant to distinguish between affirmative and negative obligations. Some "negative" rules would probably fall under § 544(f)'s bar. For instance, a local franchising authority's attempt to *prohibit* the carriage of HBO would likely implicate the same

---

**12.** The petitioners refer to the FCC's argument as "a tortuous 3,600–word conundrum euphemistically labeled 'legislative history,'" as an "especially labored exercise in calculated mischief," as "remarkable sleight-of-hand," as a "feat ... deserving of accolades," and as "a neat trick." *See* Brief of Joint Petitioners United Video, Inc., *et al.* at 29; Reply Brief of Joint Petitioners United Video, Inc., *et al.* at 12 n. 24; Supplemental Brief of Joint Petitioners United Video, Inc., *et al.* at 3 n. 6.

congressional concerns as an attempt to *require* carriage of HBO. We therefore think § 544(f) would bar such a prohibition.

On the other hand, not every "affirmative" regulation implicates § 544(f). Suppose, for instance, a cable company bidding for a local franchise indicated that it was planning to provide service on only Mondays, Tuesdays, and Wednesdays. If the local franchising authority decided that it would award the franchise only to a cable company that agreed to provide service seven days a week, it would not be, in the words of the House report, "dictat[ing] the specific programming to be provided over a cable system," even though the regulation would be affirmative in nature.

In short, we think that the affirmative/negative distinction suggested by the Commission fails to capture what Congress meant by the term "requirements" in § 544(f). Rather, the examples given in the House report suggest that the key is whether a regulation is content-based or content-neutral. Section 544(f), one must note, does not simply forbid "requirements"; it forbids "requirements regarding the *provision* or *content* of cable services" (emphasis added). The House report suggests that Congress thought a cable company's owners, not government officials, should decide what sorts of programming the company would provide. But it does not suggest a concern with regulations of cable that are not based on the content of cable programming, and do not require that particular programs or types

of programs be provided. Such regulations are not requirements "regarding the provision or content" of cable services.

Syndex is clearly different from a requirement or prohibition of the carriage of a particular program or channel. Although it will certainly affect the content of cable programming, it is content-neutral. The basis on which syndex forbids carriage of certain programs is not their content, but ownership of the right to present them. Syndex itself does not require carriage of any particular program or type of program, nor does it prevent a cable company from acquiring the right to present, and presenting, any program.[13]

We do not mean to suggest that the concept of content neutrality, as developed in first amendment cases, can be freely imported into all cases construing the Communications Act. In this case, however, the history reviewed above explicitly shows that Congress' concern in enacting § 544(f) was with content-based rules. We think it plain that Congress did not intend § 544(f) to forbid syndex. Under *Chevron's* step one, we think the Commission was bound to say that syndex rules are sufficiently different from the sorts of rules with which Congress was concerned that the statutory phrase "requirements regarding the provision or content of cable services" does not embrace them.[14]

Our conclusion that the Commission was correct to read § 544(f) as not prohibiting syndex rules, but not precisely for the rea-

---

**13.** For first amendment purposes, the Supreme Court currently defines a regulation as content-neutral if it is justified without reference to the content of the regulated speech. *See Ward v. Rock Against Racism,* — U.S. —, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989). Syndex satisfies this test: its justification is to encourage the production of diverse programming by protecting the value of the copyright on programming. Furthermore, syndex satisfies even the more stringent test of content neutrality insisted on by dissenters such as Justice Brennan, *see City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 55, 106 S.Ct. 925, 933, 89 L.Ed.2d 29 (Brennan, J., dissenting), for whether syndex protects a program turns only on whether a broadcaster owns the exclusive right to a program. Syndex applies regardless of the content of the program.

**14.** In its decision denying rehearing, the Commission also noted that the Satellite Home Viewer Act of 1988, Pub.L. No. 100–667, 102 Stat. 3949, 3958 (1988), contains an explicit reference to the Commission's new syndex rules. The Act directs the Commission to commence a proceeding to determine "the feasibility of imposing syndicated exclusivity rules with respect to the delivery of syndicated programming ... for private home viewing of secondary transmissions by satellite of broadcast station signals similar to the rules issued by the Commission with respect to syndicated exclusivity and cable television." While this Act is not itself a grant of authority to impose the syndex rules, we agree with the Commission that this specific reference to the rules supports its position that it retained authority to issue them after 1984.

sons it gave, requires us to consider whether we must strike down the rules under the doctrine of *SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). *Chenery* provides that a court can uphold an administrative rule only on the basis of the reasons given for it by the administrative agency. *Id.* at 87–88, 63 S.Ct. at 459. In this case, we can uphold the rules under *Chenery*.

The purpose of *Chenery* is to insure that courts do not trespass on agency discretion. "If an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment.... [A]n appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency." *Id.* at 88, 63 S.Ct. at 459. *Chenery* also serves to insure that administrative determinations are "made with relevant criteria in mind and in a proper procedural manner." *Massachusetts Trustees v. United States*, 377 U.S. 235, 248, 84 S.Ct. 1236, 1245, 12 L.Ed.2d 268 (1964). Hence, *Chenery* reversal is not necessary where, as here, the agency has come to a conclusion to which it was bound to come as a matter of law, albeit for the wrong reason, and where, as here, the agency's incorrect reasoning was confined to that discrete question of law and played no part in its discretionary determination.[15] *See Massachusetts Trustees*, 377 U.S. at 247–48, 84 S.Ct. at 1244–45; *G.W. Galloway Co. v. NLRB*, 856 F.2d 275, 278 n. 21 (D.C.Cir.1988); *Northside Sanitary Landfill, Inc. v. Thomas*, 804 F.2d 371, 380 n. 4 (7th Cir.1986); Friendly, Chenery *Revisited: Reflections on Reversal and Remand of Administrative Orders*, 1969 Duke L.J. 199, 211. Accordingly, we uphold the Commission's conclusion that the Cable Act does not forbid syndex.

## C. *The First Amendment*

The petitioners argue that syndex rules, like the must-carry rules that this court struck down in *Century Communications Corp. v. FCC*, 835 F.2d 292 (D.C.Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988), cannot survive even the relaxed first amendment scrutiny of *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). However, the Commission was correct to find that the rules are not subject to such scrutiny.

The petitioners repeatedly claim that syndex restrains the expression of fully protected speech which has been paid for and authorized under the compulsory licensing scheme of § 111 of the Copyright Act. *E.g.*, Brief for Petitioner Tribune at 13–14, 27 n. 13. The fact is, however, that because of the provisions of § 111, cable companies will *not* be able to obtain a compulsory license to transmit a program if transmission would violate the syndex rules. As explained above, Congress deliberately chose to withhold a compulsory license from those transmissions that the FCC decides to prohibit for reasons of communications policy. The petitioners are therefore in the position of claiming that they have a first amendment right to express themselves using the copyrighted materials of others.

This crucial fact distinguishes the case from *Century Communications*. Cases in which a first amendment defense is raised to a copyright claim do not utilize an *O'Brien* analysis. The Constitution grants Congress the power to secure for limited times to authors the exclusive right to their works, and this power generally supersedes the first amendment rights of those who wish to use another's copyrighted work. In *Harper & Row v. Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), for instance, the Supreme Court considered whether a maga-

---

**15.** The Commission was bound to conclude that § 544(f) did not forbid syndex. Having answered this legal question in what we have held to be the only permissible way, the Commission made its discretionary decision to reimpose syndex. Since the Commission correctly noted that syndex is content-neutral as well as "negative," 3 F.C.C.Rcd at 5342 n. 279, it is clear that the Commission's discretionary decision would not change if we instructed the Commission that content-neutrality was the key to § 544(f).

zine's excerpts from former President Ford's memoirs infringed their copyright even though the defendant claimed a first amendment right to quote them. The Court did not ask, as it would have if it had applied *O'Brien*, whether copyright protection furthered an important governmental interest unrelated to the suppression of free expression, and whether the incidental restriction on expression was no greater than was necessary to further that interest. The furthest the Court was willing to go was to consider whether the public importance of the excerpts might have some bearing as to whether they would be considered a "fair use" of the copyrighted work—and even this claim was rejected. *Id.* at 555–60, 105 S.Ct. at 2227–30.

■ In the present case, the petitioners desire to make commercial use of the copyrighted works of others. There is no first amendment right to do so. Although there is some tension between the Constitution's copyright clause and the first amendment, the familiar idea/expression dichotomy of copyright law, under which ideas are free but their particular expression can be copyrighted, has always been held to give adequate protection to free expression. *See id.* at 560, 105 S.Ct. at 2230; 1 Nimmer, *Nimmer on Copyright* § 1.10[B][2] (1989).

The petitioners raise several other arguments as to why the first amendment forbids syndex, but most of them are worth noting only briefly. The petitioners argue that even if Congress, using its copyright power, could forbid the petitioners' retransmission without violating their first amendment rights, the Commission lacks power to do so. The Commission, petitioners argue, instituted syndex not as a copyright measure, but to further its communications policy goal of diverse programming. Syndex regulations, the petitioners contend, "cannot be 'communications policy' for purposes of jurisdictional examination and, like a chameleon, 'copyright' for purposes of First Amendment analysis." Brief for Joint Petitioners United Video, Inc., *et al.* at 39–40.

■ This argument, like the petitioners' argument with respect to the Copyright Act, ignores the statutorily-based relationship between the Commission's regulations and copyright law. Congress, by § 111 of the Copyright Act, specifically decreed that the copyright liability of cable companies would be determined in part by the regulations of the Commission, created in furtherance of communications policy goals. Hence it is appropriate for the Commission to state that its authority to impose syndex rests on the Communications Act, but that syndex survives first amendment scrutiny as a measure protecting copyrights. Similarly, we reject the petitioners' claim, made at oral argument, that even if syndex rules, once in place, can be justified using a copyright rationale, the Commission's decision to create syndex rules must itself be subjected to *O'Brien* analysis. Congress' decision to grant copyright protection to some works but not others has never been thought to violate the first amendment. Congress decided, in § 111, that the scope of copyright protection available to television signals shall depend in part on the Commission's decisions under the Communications Act, and the Commission's decision is therefore not subject to *O'Brien*.

■ Petitioner Tribune claims that the effect of syndex on speech differs strikingly from the effect of copyright, and, in particular, that syndex's effect is much broader. Tribune notes that copyright law restricts speech narrowly by protecting only expression, not ideas. But so does syndex: syndex forbids only the transmission of particular television signals. Syndex does not forbid anybody from copying the ideas embodied in a television program; it only forbids retransmission of the program itself. A program is a particularized form of expression, not an idea.

■ Tribune notes that copyright law "builds in protection of the non-copyright holder's free speech rights through the fair use doctrine," whereas syndex does not. This argument lacks force in the context of the present case, because the use to which the cable companies wish to put the copyrighted signals of others could never be considered fair use. The cable companies wish to make their own commercial profit

by simply retransmitting the whole of another's copyrighted work in a way that, as the Commission found, diminishes the potential value of that work. This is not fair use. *See* 17 U.S.C. § 107.

Tribune also notes that copyright remedies are available only on a case-by-case basis, in legal proceedings before a federal judge, and that no relief is available unless the purported copyright owner can make a sufficient showing under law, whereas syndex will be administratively implemented. It is true that administrative penalties under the syndex rules will be in addition to any penalties that copyright law may provide. But this does not change the fact that, regardless of any administrative penalties attaching to violation of the syndex rules, a cable company that violates them is also violating the copyright laws and so lacks first amendment protection. We do not think the Commission violates the first amendment by bestowing marginally greater protection on copyrighted works than the copyright laws would themselves provide, through an alternate means of restraining cable companies from transmitting signals they have no right to transmit anyway.[16]

Finally, Tribune argues that the syndex rules are invalid because they apply even to television signals that are *not* copyrighted. If the rules indeed applied to such signals, they would raise a serious first amendment problem. However, we think that the rules simply do not apply to noncopyrighted programs. It is true that the rules, on their face, do not prevent a syndicator and a broadcaster from entering into a contract that purports to give the broadcaster the exclusive right to present a noncopyrighted program. But surely the basis for an exclusive contract must be the syndicator's ownership of the copyright to the underlying program. If the syndicator does not own the copyright to the program, it has nothing to sell to the broadcaster.

If Tribune were right that the syndex rules apply to noncopyrighted programs, then one might as well say that a syndicator and a broadcaster can agree that the broadcaster shall have the exclusive right to present a program, the copyright to which is held by some other syndicator. The rules do not *explicitly* prohibit such an agreement. But such an agreement would be obviously absurd and unenforceable. Similarly, the FCC cannot have meant syndex to apply to signals which are in the public domain. Accordingly, we hold that the syndex rules do not protect noncopyrighted programs. This disposes of the last of the petitioners' first amendment claims.

## IV. CONCLUSION

"While the deregulation of the cable television industry raises serious policy questions, ... these questions are best left to the agencies that were created, in large part, to resolve them." *Malrite TV of New York v. FCC,* 652 F.2d 1140, 1147 (2d Cir. 1981) (upholding the elimination of syndex), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982). The Commission has considered anew the question of how to balance the rights of broadcast and cable television companies so as best to serve the public interest in receiving diverse programming. Congress decided that this question should be resolved by the agency, and on the record before us we uphold its resolution.

The petitions for review are

*Denied.*

---

**16.** The question might be more difficult if, in administering syndex, the Commission would be required to make delicate judgments on fine points of copyright law, such as whether one television program was sufficiently similar to another that it infringed the other's copyright. But, as noted above, syndex forbids only the retransmission of the copyrighted program itself; the copyright questions on which the Commission will have to pass will be completely straightforward.